542 F.2d 579
 13 Fair Empl.Prac.Cas. 705,
12 Empl. Prac. Dec. P 11,212
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION et al., Appellants,
v.
ENTERPRISE ASSOCIATION STEAMFITTERS LOCAL NO. 638 of U. A.
et al., Appellees.
George RIOS et al., Appellants,
v.
ENTERPRISE ASSOCIATION STEAMFITTERS LOCAL No. 638 of U. A.
et al., Appellees.
 Nos. 976, 975, 1286 to 1289, Dockets 75-6132, 75-6140,
75-7646, 75-7668,75-7699 and 75-7011.
 United States Court of Appeals,
Second Circuit.
 Argued June 16, 1976.
Decided Sept. 7, 1976.
 
 Louis G. Corsi, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Steven J. Glassman, Asst. U. S. Atty., New York City, Abner W. Sibal, Gen. Counsel, EEOC, Joseph T. Eddins, Jr., Associate Gen. Counsel, EEOC, Beatrice Rosenberg, Atty., EEOC, Washington, D.C., of counsel), for appellant EEOC.
 Dennis R. Yeager, National Employment Law Project, Inc., New York City (Marilyn R. Walter and Robert P. Roberts, National Employment Law Project, Inc., Tufo, Johnston & Allegaert, New York City, of counsel), for appellants Rios, and others.
 Richard Brook, Delson & Gordon, New York City, for appellee Local 638.
 Thomas A. Shaw, Jr., Breed, Abbott & Morgan, New York City (Robert B. Kuhback, Breed, Abbott & Morgan, New York City, of counsel), for appellee Mechanical Contractors Ass'n of New York, Inc.
 Before MANSFIELD, OAKES and GURFEIN, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 Cross appeals, challenging backpay and attorney's fees orders in a case involving unlawful discrimination in union membership and related employment, raise a congeries of questions relating to remedial relief under Title VII of the Civil Rights Act of 1964. The underlying question of discrimination has been a matter of protracted litigation,[1] with quite careful consideration given to the issues by a district judge whose exercise of remedial discretion[2] we are, needless to say, reluctant to reverse. Separate actions brought by the Government and by individual plaintiffs ("the Rios plaintiffs") against Enterprise Association Steamfitters Local 638 of U.A. (hereinafter "Local 638" or "the union"), the Joint Steamfitters Apprenticeship Committee of the Steamfitters Industry (JAC), and the Mechanical Contractors Association of New York, Inc. (MCA), have been consolidated for the trial below, and for these appeals. The orders appealed from were entered in the United States District Court for the Southern District of New York by Dudley B. Bonsal, Judge. See 400 F.Supp. 988 (S.D.N.Y.1975) (backpay); 400 F.Supp. 993 (S.D.N.Y.1975) (attorneys' fees). A previous order of the district court providing injunctive relief has been separately reviewed in this court; the attorneys' fees and backpay issues were reserved at that time. United States v. Local 638, Enterprise Association of Steamfitters, 360 F.Supp. 979 (S.D.N.Y.1973), aff'd but remanded in part, 501 F.2d 622 (2d Cir. 1974), modified on remand sub nom., Rios v. Enterprise Association Steamfitters Local 638, 400 F.Supp. 983 (S.D.N.Y.1975). Appeal from the present orders is taken by way of certification under 28 U.S.C. § 1292(b).[3] Since appeal has not been taken from any of the district court's findings on discrimination, see 501 F.2d at 627, the only questions we have here, and they are several, relate to remedial relief.
 
 I. BACKPAY
 
 2
 The district court's assorted holdings in respect to backpay may be summarized as follows. First, backpay was to be awarded to qualified members who applied in writing for membership in A Branch[4] of Local 638, and were denied admission after October 15, 1968, but before June 21, 1973, the date of the order granting injunctive relief. See 400 F.Supp. at 992. The district court's reasoning for denying backpay to others was that damages arising from discriminatory work referral practices are not ascertainable since Local 638 had no hiring hall and there are no accurate records of job openings for the period involved; damages to individuals who did not make formal written application to the A Branch are "hypothetical"; damages suffered as a result of the administration of the apprenticeship program are "speculative"; and equitable considerations weigh against broader relief since the admission test to the apprenticeship program was registered with the United States and New York State Departments of Labor and was adopted by the defendants in good faith on the recommendation of experts. Id. at 991.[5]
 
 
 3
 Second, while ability to pay is an equitable factor to be taken into account in awarding backpay under Title VII, and the union in this case has only limited financial resources, the court concluded that the union is nevertheless liable. Id. at 991-92. In light of the union's financial situation, however, the court reserved the right to make a pro rata reduction of each claimant's award, or to provide for payments in installments, after the court has reviewed the total impact of the backpay orders. Id. at 993.
 
 
 4
 Third, the MCA is not responsible for all of the unlawful or discriminatory practices indeed, there has been no specific MCA discrimination shown, the only showing being that there has been a lack of nonwhite employment in the industry generally with the result that industry referral practices must be changed. Id. at 992. MCA was, therefore, found not liable for backpay.
 
 
 5
 Fourth, the district court held that the JAC, a joint committee composed of four members chosen by MCA and four members chosen by Local 638 which has conducted the Steamfitters Apprenticeship Program throughout the years, had no "demonstrated responsibility for direct admissions to the A Branch of Local 638 of persons already qualified as journeymen steamfitters." Id. Thus it too was found not liable. Id.
 
 
 6
 Fifth, the court adopted the two-year statute of limitations which was set forth in Pub.L. No. 92-261, §§ 4(a) (Mar. 24, 1972), 14; see 42 U.S.C. § 2000e-5(g), a statute enacted after the suit was brought and its classes defined.[6] The court also limited forward recovery of backpay to the period predating the court's order granting a permanent injunction against the unlawful discriminatory practices. 400 F.Supp. at 992. See Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 258 (5th Cir. 1974); Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1379 (5th Cir. 1974).
 
 
 7
 Sixth, the court limited backpay recovery to residents of a county within the geographical jurisdiction of Local 638 at the time of their application for membership in the Local 638 A Branch.[7] 400 F.Supp. at 993.
 
 
 8
 And seventh, the court ordered that income from other employment or from public assistance is to be deducted from any backpay award. Id.
 
 
 9
 The EEOC and the Rios plaintiffs claim that in each of the above respects the district court's order was too narrowly drawn to accord with the dictates of Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), and courts of appeals precedents. Local 638 argues on cross-appeal that the district court abused its discretion in ordering a backpay award against a union defendant in a Title VII suit. The union claims that the effect of the backpay award will be to bankrupt it, thereby destroying the affirmative relief granted and frustrating the policy of the Act. The union also points to the lack of evidence that it had engaged in purposeful discrimination against nonwhites in connection with work referrals, see 360 F.Supp. at 990. We will consider first the union's claim on the cross-appeal, and then the issues raised by the appellants.
 
 
 10
 A. Liability of Union for Backpay. We agree with the Government and the Rios plaintiffs that the union's arguments against a backpay award amount to a claim for special treatment for unions and special immunity for the discriminatory practices in which they engage. This claim has no support in equity or law. The statute, which refers to "back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice) . . .," 42 U.S.C. § 2000e-5(g), is directly to the contrary. To be sure, Albemarle, supra, did approve a backpay award against an employer rather than a union. But the Court quoted with evident approval from United States v. N. L. Industries, Inc., 479 F.2d 354, 379 (8th Cir. 1973), stating that "(i)t is the reasonably certain prospect of a backpay award that 'provide(s) the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history.' " Albemarle, supra, 422 U.S. at 417-18, 95 S.Ct. at 2371 (emphasis added). In the parallel sheet metal-construction-workers' case, EEOC v. Local 638 . . . Local 28 of the Sheet Metal Workers' International Association, 532 F.2d 821 (2d Cir. 1976) (hereinafter Sheet Metal Workers ), backpay awards against the union (as well as against a joint apprenticeship committee) were upheld, the court taking into account the language of Albemarle, supra, that "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." Albemarle, supra, 422 U.S. at 421, 95 S.Ct. at 2373, quoted in Sheet Metal Workers, supra, 532 F.2d at 832. Since in many instances it may well be that union, rather than employer, discrimination is the prime factor resulting in the evil proscribed under Title VII, any broad rule that unions are exempt from the equitable backpay award could well "frustrate the central statutory purposes" of the Act, as those are defined in the Albemarle opinion.
 
 
 11
 The union, however, makes the special claim that it should be exempted from the backpay award issued in this case because the amount of the award is potentially so large that the union may be driven into bankruptcy, thereby destroying its capability to provide affirmative relief for its new minority members. This claim of financial exigency seems premature at this stage. It is by no means apparent that the backpay award will wreak the disastrous consequences and summon forth the parade of horrors that the union envisages. The record lacks any evidence showing that the union faces imminent financial distress should backpay be awarded; any evidence on this issue the district court may consider prior to its entry of a final backpay order. Therefore we do not now pass upon the propriety of any reduction, either under the law or the facts as they may be developed. Indeed, it may not be amiss to point out that the union and its pre-1968 membership have financially benefited from its policy of excluding minority applicants from access to employment opportunities which the union has historically controlled. It is, therefore, no abuse of discretion to require relief for appellees which may, if only indirectly, adversely affect the interests of other union members. See Franks v. Bowman Transportation Co., 424 U.S. 747, 774, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (retroactive seniority); Patterson v. Newspaper & Mail Deliverers' Union of New York and Vicinity, 514 F.2d 767, 775 (2d Cir. 1975).
 
 
 12
 Ample authority exists in other circuits for the award of backpay against unions for Title VII violations, either solely, where the union was primarily responsible, Guerra v. Manchester Terminal Corp., 498 F.2d 641, 655-56 (5th Cir. 1974), or against unions and employers jointly, where responsibility for the discrimination is shared, e. g., Waters v. Wisconsin Steel Works of International Harvester Co., 502 F.2d 1309, 1321 (7th Cir. 1974), cert. denied, --- U.S. ----, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). See also UTU, Local 974 v. Norfolk & Western Railway Co., 532 F.2d 336 (4th Cir. 1975), cert. denied, --- U.S. ----, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976). The practice is the same under the National Labor Relations Act in cases where a union has caused an employer to discriminate against non-union or non-conforming union employees. See Radio Officers Union v. NLRB, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). The NLRA example was thought to be the strongest analogy to the Title VII situation by the Supreme Court in Albemarle, supra, 422 U.S. at 419, 95 S.Ct. 2362. That opinion points out that the legislative history of the Title VII backpay provision states that it was "expressly modeled" on the NLRA backpay provision. Id.
 
 
 13
 B. Limitation of Relief to Persons Applying In Writing to Branch A for Membership. The Rios plaintiffs and the EEOC challenge this portion of the district court's order on two bases first, that the limitation to those who can prove they applied in writing for membership is invalid as too restrictive as to those who have applied, and, second, that many of the people discriminated against, but who never actually applied for union membership, will be precluded from recovery. The first issue raised is easy to resolve, the second more difficult.
 
 
 14
 Judge Bonsal's order denies backpay to persons who do not possess written evidence of their application for union membership. His order was handed down prior to this court's decision in Sheet Metal Workers, supra, which in reliance on Albemarle, supra, disapproved a similar order in the sheet metal-workers' case. As the court said in Sheet Metal Workers, limiting backpay to those who apply in writing or can provide documentary proof would serve to "frustrate the central statutory purposes" of Title VII, especially since one reason that there may be no documentary proof is that the Local and the Joint Apprenticeship Council there, as here, kept incomplete records of their membership applications. 532 F.2d at 832. "To deny back pay to persons who, as a result of the union's actions, have no written proof is to reward the union and the JAC for their record-keeping failures." Id. (emphasis original). Thus the order of the district court in this respect must be reversed. Testimonial evidence may be received as in any other litigation, so that victims of discrimination in admission to journeyman membership in the A Branch of the union, who actually applied therefor, may recover whether or not they made formal written application.
 
 
 15
 Appellants' second claim is that specific classes of persons who may be able to present evidence of individual discrimination are excluded from recovery by the district court's backpay order. The court's order limits recovery to those who applied for A Branch membership. Two other very significant groups are excluded by this order: those who were discriminatorily denied work referrals both before and after they were finally admitted to the A Branch, 360 F.Supp. at 990-91, and those who failed discriminatory apprentice entrance exams and therefore did not make membership application,id. at 991-92.
 
 
 16
 We are agreed that the force of Albemarle and other Title VII case law requires that any nonwhite steamfitter, whether a union member or not, who claims that he was discriminated against by work referral practices is entitled to prove the discrimination against him and any resulting damages. Presumably he would have to show that despite his efforts to find work with a contractor or with a steamfitting subcontractor he was turned down. He would also have to show that the union referred only white union members, "permit men"[8] or B Branch men to the jobs the nonwhite steamfitter sought, which were filled by those referred. There will be, obviously, difficult problems of proof for any individual plaintiff, but we see no valid reason for precluding these persons from attempting to produce such proof. As the Fourth Circuit said in Hairston v. McLean Trucking Co., 520 F.2d 226 (4th Cir. 1975), " 'unrealistic exactitude is not required' in back pay determinations . . .." Id. at 233. Similarly, "uncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the discriminating (party)." Id. See also United States v. United States Steel Corp., 520 F.2d 1043, 1058 (5th Cir. 1975), petition for cert. filed, 44 U.S.L.W. 3649 (U.S. May 18, 1976); Pettway v. American Cast Iron Pipe Co., supra, 494 F.2d at 260-61; Johnson v. Goodyear Tire & Rubber Co., supra, 491 F.2d at 1380 n.53. We agree with the EEOC and the private appellants that good faith is not a defense in a Title VII case, and that such a defense is equally inapplicable to claims for backpay as well as other relief. Albemarle, supra, 422 U.S. at 422-23, 95 S.Ct. 2362; Griggs v. Duke Power Co., 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). See also Washington v. Davis, --- U.S. ----, ----, 96 S.Ct. 2040, 48 L.Ed.2d 736 (1976).
 
 
 17
 The writer of this opinion would apply the same principles to those who were victims of discrimination in the apprenticeship program. While their problems of proof might be even greater, individuals should not be precluded from establishing loss of pay by appropriate proof where as here, admission to the program by test was not job-related. The JAC has kept a record of all persons who applied for the apprenticeship program, and the results obtained by those who took the written test. The writer fails to perceive any reason to distinguish the situation of nonwhites who were discriminatorily denied apprenticeship, or who became indentured apprentices, but who lost wages as a result of illegal employment discrimination, from the situation of nonwhite journeymen who lost wages for the same reason. See Pettway v. American Cast Iron Pipe Co., supra, 494 F.2d at 258-59 (persons denied admission to apprenticeship program eligible for backpay.) I would read the language of Sheet Metal Workers, supra, to apply to individuals seeking backpay as a result of discrimination in the apprenticeship program.
 
 
 18
 My brothers Mansfield and Gurfein, however, feel quite otherwise. They believe it to be within the proper exercise of the conceded discretion of the district court, Albemarle, supra, 422 U.S. at 421-23, 95 S.Ct. 2362, to deny as hypothetical any backpay in connection with the apprenticeship program, at least where, as here, there was no purposefully bad motive. In their view, even though would-be nonwhite apprentices were victims of discrimination by the JAC, their injury is too remote, and any damages suffered by them altogether too speculative in the sense of the problem of proof, to permit an award. In this regard my brothers point out that an applicant would have to prove the following essential elements to recover:
 
 
 19
 That if nondiscriminatory tests for admission to the program had been formulated and administered (which, of course, never occurred), the applicant would have passed them;
 
 
 20
 That he would have progressed satisfactorily through the three- or four-year program to graduation; and
 
 
 21
 That he would then have obtained employment as a steamfitter.
 
 
 22
 My brothers emphasize the Supreme Court's recognition in Albemarle that "the trial court will often have the keener appreciation of those facts and circumstances peculiar to particular cases." Id. at 421-22, 95 S.Ct. at 2373. This language, they point out, clearly leaves room for district court discretion, the exercise of which was not abused in this instance, where difficult problems of proof in any event are presented.
 
 
 23
 We are all agreed that those who were deterred from applying to the A Branch but who were not discriminated against in work referral practices should be denied recovery. It is one thing to grant retroactive or constructive seniority to discriminatees deterred from applying for jobs or promotions, as in Acha v. Beame, 531 F.2d 648 (2d Cir. 1976), or in Chance v. Board of Examiners, 534 F.2d 993, at 1007 (2d Cir. 1976) (on petition for rehearing). It is another thing to grant backpay to those who never applied for a job because they thought it was useless to do so. As pointed out in Sheet Metal Workers, supra, 532 F.2d at 833 n.6, the seniority remedy is "far less drastic for a defendant" than the remedy of backpay. Moreover, the retroactive seniority afforded in Acha and Chance was, by the very nature of the remedy, limited to those who were actually employed. The relief of backpay in our situation would not be so limited; the number of potential claimants and the potential burden on defendants is, as in Sheet Metal Workers, supra, much greater.
 
 
 24
 We all recognize the administrative burdens that the trial of a backpay suit necessarily imposes upon the district court. We fully recommend that the court utilize its full powers under 28 U.S.C. § 636 and Fed.R.Civ.P. 53, to refer these matters to a special master, who may under the statute be a magistrate if permitted by local rule, for a comprehensive report. Pettway v. American Cast Iron Pipe Co., supra, 494 F.2d at 258. As the Pettway court pointed out, this does not preclude a negotiated settlement.
 
 
 25
 C. Liability of MCA. MCA is a trade association of approximately 60 out of the some 300 heating, ventilating and air conditioning contractors in the New York area which employ steamfitters. The 60 MCA members employ the major share of the steamfitter labor force and MCA represents its members in collective bargaining negotiations and other labor relations. 360 F.Supp. at 985. Over the decade 1960-69, the MCA steamfitting contracts within New York City and Nassau and Suffolk Counties never totaled less than $77 million and were as high as $118 million. Id. at 986. Generally speaking, steamfitting contractors maintain steady crews which are moved from job to job as work on new contracts begins and old contracts are completed. When additional personnel are required, some contractors hire them directly; other contractors hire through their superintendents and in fewer instances through their foremen. Id. In collective bargaining negotiations in 1966 and 1969, MCA tried to require the indenturing into the industry of a minimum of 150 new apprentices annually, but the union rejected these proposals. Id. at 988. The court found that there was no evidence that "either Local 638 or MCA has engaged in purposeful discrimination against nonwhites." Id. at 990. But it did find that "the conditions of the industry . . . in combination with the history of discrimination in admissions to the A Branch of Local 638, give whites advantages in obtaining employment." Id. MCA was enjoined from further discrimination and ordered to maintain up-to-date records of available work, to submit an affirmative action program, to use its best efforts to provide apprentices with 1,750 hours of work per year and to maintain an employment register. The Rios plaintiffs argue, not without reason, that this relief could not have been ordered absent a finding of discrimination by MCA, purposeful or otherwise, and that all that is required to establish MCA's liability for backpay is the finding of discrimination; indeed, mere acquiescence in the discriminatory acts of the union would render it liable. Johnson v. Goodyear Tire & Rubber Co., 491 F.2d at 1381-82; Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979, 989 (1973). See also Robinson v. Lorillard Corp., 444 F.2d 791, 799 (4th Cir.), petition for cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). Absent any specific finding of discrimination, however, we conclude the district court's finding of nonliability on the part of MCA is not an abuse of discretion. Guerra v. Manchester Terminal Corp., supra, 498 F.2d at 655-56. As the district court held, making MCA a party defendant did not imply that MCA was "responsible ipso facto for all the employment practices . . . found unlawfully discriminatory or . . . liable in damages to the plaintiffs in Rios. Plaintiffs have shown so specific instances of MCA discrimination." 360 F.Supp. at 995. And the union certainly had primary responsibility for the discrimination. We note that the decision below was without prejudice to any claim a member of the plaintiff's class may have against an employer, but MCA was not itself an employer, and no employers are parties to this action. See 400 F.Supp. at 922 n.4.
 
 
 26
 D. Liability of the JAC. The JAC as we have said is a joint labor management committee composed of four members chosen by MCA and four members chosen by Local 638. The major function of the JAC is to supervise the steamfitters' apprenticeship program. The four management trustees are designated by MCA and serve at the will of MCA, which can at any time terminate the designation of a trustee by resolution of the MCA board of directors. One of the JAC directors is the MCA executive secretary. The union trustees on the JAC are three of the principal union officers. The district court found that the apprenticeship program conducted by the JAC did not "fully meet the requirements of Title VII." 360 F.Supp. at 991. The court went on to hold that the written tests given to apprenticeship applicants since 1967 had a differential impact on nonwhites, and that the defendants had not met their burden of proving that the tests were "job-related," at least until they began administering the general aptitude test battery as indicated at the time of trial. See 360 F.Supp. at 992. However, the district court held that the
 
 
 27
 JAC has "no" demonstrated responsibility for direct admissions to the A Branch of Local 638 of persons already qualified as journeymen steamfitters.
 
 
 28
 Therefore, only Local 638 is liable for back pay. 400 F.Supp. at 992 (footnote omitted). Appellants claim that the district court has abused its discretion by refusing to make the JAC jointly liable with the union for backpay damages. We disagree.
 
 
 29
 The reasoning of the district court is evidently premised on its view, fully supported in the record, that the union was the dominant factor in creating and perpetuating the discriminatory membership criteria. The court could well have concluded from the record before it that although JAC was a participant in the lesser of the discriminatory practices, the major blame for both the discriminatory examinations and the more invidious direct admission policy lay squarely with the union. This consideration, in addition to the fact that it was the union and its members, rather than the JAC itself, which profited from the unlawful practices,[9] indicates that it was no abuse of discretion for the district court to require the union to shoulder the entire responsibility for backpay. See Guerra v. Manchester Terminal Corp., supra, 498 F.2d at 655-56.
 
 
 30
 E. Statute of Limitations. In these combined actions, the Government filed suit on June 29, 1971, under Title VII and the private plaintiffs filed suit on February 26, 1971, under Title VII and also under42 U.S.C. §§ 1981, 1983. The Rios plaintiffs had initially filed their charge of discrimination with the New York Division of Human Rights on August 19, 1970, and with the EEOC on October 15, 1970. When these actions were first brought there was no specific applicable federal statute of limitations. On March 24, 1972, Congress enacted the Equal Employment Opportunity Act of 1972, § 706(g) of which provides for a statute of limitations barring actions arising more than two years prior to the filing of a charge with the EEOC. 42 U.S.C. § 2000e-5(g). The district court applied the 1972 statute retroactively to this case, reasoning that the amendment had "a bearing on Congressional intent as to the limitation to be imposed in granting back pay awards." 400 F.Supp. at 992. Therefore the court ordered backpay only for the period after October 15, 1968.
 
 
 31
 We disagree with this retroactive application of the new statute of limitations rule, as have the Fifth and Sixth Circuits. See EEOC v. Detroit Edison Co., 515 F.2d 301, 315 (6th Cir. 1975), petition for cert. filed, 44 U.S.L.W. 3214 (U.S. Oct. 7, 1975); United States v. Georgia Power Co., 474 F.2d 906, 922 n.21 (5th Cir. 1973). The subsequent enactment cannot be indicative of the prior congressional intent.
 
 
 32
 Prior to the enactment of the federal statute, we would, of course, look to the analogous state statute of limitations. See Chevron Oil Co. v. Hudson, 404 U.S. 97, 104 (1971); Jones v. Trans World Airlines, Inc., 495 F.2d 790, 799 (2d Cir. 1974); Swan v. Board of Higher Education, 319 F.2d 56, 59 (2d Cir. 1963). This rule has been applied in backpay cases as well. See Franks v. Bowman Transportation Co., 494 F.2d 398, 405 (5th Cir. 1974), aff'd, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); Pettway v. American Cast Iron Pipe Co., supra, 494 F.2d at 258; Johnson v. Goodyear Tire & Rubber Co., supra, 491 F.2d at 1378. The analogous New York statute of limitations is N.Y. Civ.Prac. L.R. § 214(2) which establishes a three-year limit for "an action to recover upon a liability . . . created or imposed by statute. . . ." This statute has been applied in the context of federal civil rights actions on more than one occasion. DeMatteis v. Eastman Kodak Co., 511 F.2d 306, 311-12 n.8 (2d Cir. 1975); Kaiser v. Cahn, 510 F.2d 282, 284 (2d Cir. 1974). Applying the three-year time bar, appellants would be entitled to assert backpay claims accruing as early as August 19, 1967, i. e., three years prior to the date of filing of the first charge with the New York Division of Human Rights. See Hutchings v. United States Industries, Inc., 428 F.2d 303, 308-09 (5th Cir. 1970).
 
 
 33
 We also agree with appellants that since the purpose of backpay is to make whole the victims of discrimination, Albemarle Paper Co. v. Moody, supra, the district court erred in setting June 21, 1973, the day when it ordered injunctive relief, as the termination date for the backpay award. Obviously, the injunctive relief did not provide for immediate entry into the A Branch for all identifiable victims of past discrimination (much less immediate job placement of those who had been denied equal job referrals). It is the date of actual remedying of discrimination, rather than the date of the district court's order, which should govern. Patterson v. American Tobacco Co., 535 F.2d 257, at 268-269 (4th Cir. 1976). We agree with the Government that to hold otherwise is to encourage the union to delay the remedial process rather than to encourage the rapid achievement of the discrimination victims' rightful place.
 
 
 34
 F. Residence Requirement. The district court required backpay claimants to prove residence within the geographic jurisdiction of the union at the time of the application for membership. The union argues that this limitation lies within the district court's discretion on the basis that residence is an indication of an individual's availability for work within the union's geographic jurisdiction. We fail to see the logical relationship of this argument to the issue whether a given individual is entitled to backpay. During the relevant period there was no residence requirement for admission of qualified journeymen directly into A Branch. The membership requirements were that the applicant have five years' experience in the plumbing and pipefitting industry and good moral character. But the class, as defined by Judge Tenny, note 6 supra, entitled to relief is limited to those nonwhites residing in New York City and the Counties of Suffolk and Nassau, so that Judge Bonsal's order simply reflects that definition, and we therefore do not disturb it.
 
 
 35
 G. Deduction of Public Assistance. The district court ordered that "public assistance" was to be deducted from any backpay awarded. Title VII provides only that "(i)nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g). The Rios plaintiffs object to the offset of public assistance payments from backpay, and refer us to the NLRB model, so extensively relied upon by the Supreme Court in Albemarle. In the NLRB context, the Supreme Court held in NLRB v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951), that the Board has the power to enter an order refusing to deduct unemployment compensation payments from backpay. See also Marshall Field & Co. v. NLRB, 318 U.S. 253, 255, 63 S.Ct. 585, 87 L.Ed. 744 (1943). It is evidently NLRB policy to disallow deductions for collateral benefits of this nature. 340 U.S. at 365, 71 S.Ct. 3377. But in Satty v. Nashville Gas Co., 522 F.2d 850 (6th Cir. 1975), petition for cert. filed, 44 U.S.L.W. 3254 (U.S. Oct. 28, 1975), the Sixth Circuit held that a backpay award under Title VII is to be "reduced by temporary wages and unemployment insurance." Id. at 855. This statement was based on Head v. Timken Roller Bearing Co., 486 F.2d 870 (6th Cir. 1973), which in turn relied upon Robinson v. Lorillard Corp., supra, 444 F.2d at 802, for the view that "(t)he back pay award is not punitive in nature, but equitable intended to restore the recipients to their rightful economic status absent the effects of the unlawful discrimination." See also Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 721 (7th Cir. 1969) (deduction of unemployment compensation proper as exercise of trial court discretion).
 
 
 36
 The weight of common law authority is that collateral sources are not deductible from a tort damage award. See 2 F. Harper & F. James, The Law of Torts § 25.22, at 1343 n.1 (1956). But see Coyne v. Campbell, 11 N.Y.2d 372, 230 N.Y.S.2d 1, 183 N.E.2d 891 (1962) (New York law view that purpose of tort remedy is to restore the net rather than gross harm suffered by the plaintiff). However, in a number of states, where the collateral source is wholly derived from the contributions of the employer, offset for payments from the fund will be required. F. Harper & F. James, comment to § 25.22 nn.5-6, at 153-54 (1968 Supp. to Vol. 2). Where payment has been received from a fund obtained only in part from contributions made by the defendant, the majority rule is that no offset is allowed. Id.; see United States v. Harue Hayashi, 282 F.2d 599 (9th Cir. 1960) (no deduction for federal Social Security benefits). Since funds for public assistance are collected only in part from the MCA members, and not even in part from the JAC and the union, the weight of common law authority would support denial of the offset.
 
 
 37
 As a matter of policy, however, we are inclined to agree with the Satty case and the rulings in other circuits which have held it not an abuse of discretion to deduct sums received from collateral sources such as unemployment compensation. While it was employer rather than union contributions that went toward the underlying payments of unemployment compensation by the Government, absent such a governmental scheme the bargaining power of unions would surely be increased and their own wages (and hence dues) very probably greater. We see no compelling reason for providing the injured party with double recovery for his lost employment; no compelling reason of deterrence or retribution against the responsible party in this case; and we are not in the business of redistributing the wealth beyond the goal of making the victim of discrimination whole.
 
 
 38
 H. Pro Rata Modification. The district court reserved the right in the event that the total award for backpay was too great for the union to pay either to modify the award on a pro rata basis or to provide for payments in installments. The district court has thus indicated that ability to pay is a factor it may consider in its determination of appropriate equitable relief under Title VII. See United States v. Georgia Power Co., supra, 474 F.2d at 919-22. While the parties have briefed the question extensively, we think the issue is premature at this stage and decline to take a position on it. See Part A, supra. We note, however, our agreement with the general proposition that remedial obligations under Title VII are just as important and entitled to just as great a call on the union resources as more traditional functions. The Title VII responsibilities, in other words, are of the same importance and entitled to the same support through dues or assessments of members as any other duty of the union. Cf. Franks v. Bowman Transportation Co., supra, 424 U.S. at 747, 96 S.Ct. 1251; United States v. Bethlehem Steel Corp., 446 F.2d 652, 662-64 (2d Cir. 1971). But it would be an academic exercise for us to determine at this stage whether any given pro rata deduction under all the circumstances would or would not be permissible. The question may not arise; if it does then the balance of factors to be considered will be more concretely framed at that time.
 
 II. ATTORNEY'S FEES
 
 39
 The district court found that on the Rios plaintiffs' motion for attorney's fees in the sum of $128,092.50 would ordinarily be awarded on the basis of the hours spent and rates suggested if the fees were to be paid by a profit-making defendant. 400 F.Supp. at 996.[10] In view of the fact that the fees were ordered to be paid solely by Local 638, whose members will bear the burden, and in view of the fact that the Rios plaintiffs were represented by a public interest law firm, the National Employment Law Project, which is substantially funded by the federal government via the EEOC, the district court reduced the award to $50,000. 400 F.Supp. at 993-97. On cross appeals the Rios plaintiffs claim the whole amount should be paid and Local 638 argues that the applicable statute,[11] which provides that only a prevailing party "other than the (EEOC) or the United States" may be awarded attorney's fees, requires that none of appellants' counsel should recover fees in this case. The union's claim is that since the National Employment Law Project is principally funded by the United States Government, to award fees to it would run counter to the statutory policy. As the union argues, and the First Circuit held in Hoitt v. Vitek, 495 F.2d 219, 220 (1st Cir. 1974), undertaking a non-fee-paying case is the job of a public interest attorney who is salaried principally through federal funding. Certainly any fee recovery will accrue to the funded Project, since the individual public interest attorney will not increase his income as a result of the award of fees.
 
 
 40
 But we read the statute to proscribe less than the union claims. The statutory prohibition applies only where the EEOC or the United States Government is the prevailing party. Here the Rios plaintiffs are the prevailing parties and their attorney, the Project, is neither a party nor a branch of the United States Government; rather, the Project is a nonprofit corporation which receives some of its funding from non-governmental sources. Even though that nonfederal funding is very small, we have no idea how long the federal funding may continue. Indeed, it may have been the intent of Congress that at some point public interest firms that are awarded fees will be able to function on their own, to carry out the beneficent purposes of the Act. Moreover, even if federal funding were to continue at pre-existing levels, an award of attorney's fees would presumably enable the Project to expand its activities beyond those possible under the federal grant. Accordingly we hold that the Project is entitled to an award.
 
 
 41
 The making of an attorney's fees award is discretionary under the statute. We do not think that the district court has abused its discretion by awarding the Project less than might have been paid to a non-federally funded law firm. As it turns out, dividing the fee by the total number of hours spent it appears that the rate per hour is approximately what defense counsel receive under the Criminal Justice Act.[12] This seems to us a permissible pay scale under all the circumstances.[13]
 
 
 42
 Judgment in accordance with opinion.
 
 
 
 [1]
 See Rios v. Enterprise Ass'n Steamfitters Local 638, 400 F.Supp. 983 (S.D.N.Y.1975); United States v. Local 638, Enterprise Ass'n of Steamfitters, 360 F.Supp. 979 (S.D.N.Y.1973), aff'd but remanded in part, 501 F.2d 622 (2d Cir. 1974); United States v. Local 638, 337 F.Supp. 217 (S.D.N.Y.1972); Rios v. Enterprise Ass'n Steamfitters Local 638, 326 F.Supp. 198 (S.D.N.Y.1971); Rios v. Enterprise Ass'n Steamfitters Local 638, 54 F.R.D. 234 (S.D.N.Y.1971). See also Rios v. Enterprise Ass'n Steamfitters Local 638, 520 F.2d 352 (2d Cir. 1975) (denying postjudgment intervention on part of certain B Branch members, note 4 infra )
 
 
 [2]
 A discretion which, however, must be "measured against the purposes which inform Title VII," including "the purpose . . . to make persons whole for injuries suffered on account of unlawful employment discrimination." Albemarle Paper Co. v. Moody, 422 U.S. 405, 417, 418, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975). The Albemarle Court would have the court of appeals "maintain a consistent and principled application of the backpay provision, consonant with the twin statutory objectives (of eradicating discrimination and making the victims of discrimination whole) . . ." 422 U.S. at 421, 95 S.Ct. at 2373
 
 
 [3]
 See also Fed.R.App.P. 5
 
 
 [4]
 The A Branch is the construction branch of the union. Its members have the status of journeymen and do mainly construction work. The metal trades or B Branch members generally work in shops and do repair work. But see Rios v. Enterprise Ass'n Steamfitters Local 638, 520 F.2d 352, 354 (2d Cir. 1975). A Branch members receive higher hourly rates of pay. Membership in the A Branch is a substantial aid in obtaining a job as a construction steamfitter, is a prerequisite to certain job security and is of assistance in terms of advancement and overtime pay. 360 F.Supp. at 984-85
 
 
 [5]
 It is to be noted that two days before the district court's decision the Supreme Court held that " 'good faith' is 'not a sufficient reason for denying backpay,' " and that "the mere absence of bad faith simply opens the door to equity; it does not depress the scales in the employer's favor." Albemarle Paper Co. v. Moody, 422 U.S. 405, 422, 95 S.Ct. 2362, 2374, 45 L.Ed.2d 280 (1975)
 
 
 [6]
 The classes defined by Judge Tenney were two: (A) all nonwhites residing in New York City and the Counties of Suffolk and Nassau in the State of New York who now or at any time in the future have the skills necessary to work as journeymen steamfitters; and (B) all nonwhites residing in New York City and the Counties of Suffolk and Nassau in the State of New York who now or at any time in the future are capable of learning such skills and who wish to obtain access to steamfitting work in New York City and said counties. See memorandum filed in Rios v. Enterprise Ass'n Steamfitters Local 638, 54 F.R.D. 234 (S.D.N.Y.1971) (Tenney, J.)
 
 
 [7]
 That includes the five New York City counties, as well as Nassau and Suffolk
 
 
 [8]
 "Permit men" are those who work with union "permits," often relatives and friends of union members
 
 
 [9]
 By artificially limiting the number of qualified union members, the union placed itself in a stronger bargaining position for wage increases in its negotiations with the contractors. Thus, while the union members economically benefited from the discrimination (not only in possible higher hourly rates or access to overtime pay, but also in the restriction of steamfitter employment to "whites only"), the contractor members of the MCA were no better off and may well have had to pay higher wages than they would have in a freer labor market. The JAC is not shown to have received any economic benefit from the discrimination
 
 
 [10]
 There was full compliance with the stringent record-keeping requirements of City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974)
 
 
 [11]
 42 U.S.C. § 2000e-5(k) which provides in part:
 In such action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs . . . .
 This takes the case out of the scope of Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).
 
 
 [12]
 Fifty thousand dollars divided by 2449.75 hours, see 400 F.Supp. at 996, equals $20.41. Cf. 18 U.S.C. § 3006A(d) ($30 per hour for time expended in court, $20 per hour out of court)
 
 
 [13]
 In Torres v. Sachs, 538 F.2d 10 (2d Cir. 1976), the court rejected the argument that publicly-funded law firms must be paid less than the rates applicable to fee-charging counsel. The court did not have before it the question whether the factor of public funding could be considered by the district court in its discretionary determination of an appropriate attorney's fee. We believe that the Title VII prohibition against fees for federal enforcement agencies indicates that it is appropriate for the district court, by analogy, to consider the factor of federal funding in its computation of a discretionary attorney's fee award