Fannie SIMS, Plaintiff,

v.

MME. PAULETTE DRY CLEANERS, Noubar Mahdessian, Ann Mahdessian, Steven Doe, Henry Doe, and Harry Doe, Defendants.

No. 82 Civ. 5438 (MEL).

United States District Court, S.D. New York.

June 26, 1986.

David W. Weschler, Community Law Offices, New York City, for plaintiff; Marc M. Arkin, Debevoise & Plimpton, New York City, of counsel.

Arthur L. Diamond, Melville, N.Y., for defendants Mme. Paulette Dry Cleaners, and Noubar and Ann Mahdessian.

LASKER, District Judge.

On February 14, 1984 summary judgment was granted against Mme. Paulette Dry Cleaners ("Mme. Paulette"), Noubar Mahdessian and Ann Mahdessian for violation of, *inter alia*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the Fair Labor Standards Act of 1938, as amended by the Equal Pay Act of 1963, 29 U.S.C. §§ 201 *et seq.* ("FLSA")[1] substantially on the basis of the defendants' admissions that they altered the conditions of Fannie Sims' employment as a "presser" and ultimately discharged her because she filed a sex discrimination complaint against them with the Equal Employment Opportunity Commission ("EEOC"). *Sims v. Mme. Paulette Dry Cleaners*, 580 F.Supp. 593 (S.D.N.Y.

---

**1.** Plaintiff also sought redress under "§ 296 of the New York Human Rights Law [and] §§ 194 & 198–C of the New York Payment of Wages Act." *Sims v. Mme. Paulette Dry Cleaners*, 580 F.Supp. 593, 594 n.2 (S.D.N.Y.1984).

1984). Sims seeks to recover $33,378.50 from the defendants for their retaliatory acts. Specifically, Sims seeks $13,270.25 in backpay, $13,270.25 in liquidated damages, $6,838.00 in front pay in lieu of reinstatement, and an unspecified amount in prejudgment interest and attorneys' fees.

## I. Service of Process

Ann and Noubar Mahdessian assert that the court lacks personal jurisdiction over them because they were not properly served. Sims filed the Complaint in this action on August 20, 1982. According to the detailed affidavit of the process server hired by Sims, Ann and Noubar Mahdessian were personally served at their place of business on August 20, 1982. After the defendants raised improper service as an affirmative defense in their September 10, 1982 Answer to the Complaint, Ann Mahdessian was served a second time at her place of business on September 16, 1982 and Noubar Mahdessian was served in his home on September 29, 1982. The Mahdessians deny that they were served.

We do not reach this factual dispute between the parties because we find that the defendants have waived the right to assert improper service as a defense.

A hearing solely on the issue of damages was scheduled for April 22, 1985. On April 19, 1985 defendants untimely submitted a pretrial order and brief which raised the question of improper service for the first time since the defense was asserted in the 1982 Answer. The pretrial order stated only that "the action must be dismissed for failure to comply with Rule 4. Rules Civil Practice, U.S.D.C." The defendants did not give any basis for the assertion or make any offer of proof in their pretrial papers, nor had they done so at any time prior to the hearing.

The hearing as to damages went forward on the scheduled date. However, defendants were instructed to include with their post-trial briefs an offer of proof addressed to the issue of the court's personal jurisdiction if they could do so in good faith. Thereafter, the defendants submitted affidavits denying that the Mahdessians were ever personally served.

It is well settled that lack of personal jurisdiction is a privileged defense that can be waived "by failure [to] assert [it] seasonably, by formal submission in a cause, or by submission through conduct." *Neirbo Co. v. Bethlehem Corp.,* 308 U.S. 165, 168, 60 S.Ct. 153, 155, 84 L.Ed. 167 (1939); *see Marcial Ucin, S.A. v. S.S. Galicia,* 723 F.2d 994, 996 (1st Cir.1983). Although Rule 12(h)(1) does not provide a time limit for contesting service of process, other than the 20–day period for filing a responsive pleading, the defense must be made in a reasonably timely manner or it is waived [further citations omitted].

*Burton v. Northern Dutchess Hospital,* 106 F.R.D. 477, 480–81 (S.D.N.Y.1985).

In *Burton,* the plaintiffs moved to strike the allegations in the Answer of improper service on the ground that the defendants had waived the defense. The motion was granted. The court found that the defendants' conduct in failing to avail themselves of opportunities to contest the sufficiency of service of process in the three and one-half years that the action was pending, consenting to a change of venue from Connecticut to the Southern District of New York, participating in extensive discovery, and the fact that defendants previously had moved to dismiss a portion of the complaint without raising the sufficiency of service issue, was inconsistent with the defendants' assertion that the court lacked jurisdiction. The *Burton* court stated:

Defendants have literally complied with Rule 12(h)(1) by asserting the defense of lack of jurisdiction in their answers. These responsive pleadings, however, do not preserve the defense in perpetuity. Defendants are required at some point to raise the issue by motion for the court's determination. After preserving the jurisdictional defense in their answers, defendants should have sought discovery immediately to ascertain whether service was proper. If they discovered that service was not proper, defendants should have moved at the earli-

est possible opportunity to dismiss the complaint.

*Id.* at 481; *accord Vozeh v. Good Samaritan Hospital,* 84 F.R.D. 143, 144 (S.D.N.Y. 1979) (court held motion to dismiss the complaint barred by laches and waiver where there was a two-year lapse between the Answer asserting improper service and the motion to dismiss); *see also Merz v. Hemmerle,* 90 F.R.D. 566 (E.D.N.Y.1981) (finding defendant waived her otherwise timely objection to manner in which process was served when she filed cross claim and later obtained court's approval to file third-party claim).

We find this reasoning sound as well as relevant to the case at hand. Although the defendants raised the improper service issue in their 1982 Answer, they did not again address the subject until the eve of trial. In the interim, Sims again served the Complaint and prepared for the hearing with no knowledge that the defendants still contested the sufficiency of service until she received the defendants' pretrial papers.

A finding of waiver is particularly appropriate in this case because the Mahdessians actively defended this lawsuit on the merits by responding to Sims' motion for summary judgment. It is significant that the defendants did not cross-move to dismiss the complaint or otherwise raise improper service before, or at the time that they answered Sims' motion.[2] There can be little doubt that the assertion of improper service in an Answer does not entitle a defendant to wait until an adverse verdict has been rendered by either a jury or the court and then move to dismiss the complaint for insufficient service. The fact that the decision against the defendants in this case was rendered on the basis of a summary judgment motion, rather than after a hearing, does not compel a contrary conclusion. Accordingly, we conclude that the defend-

ants' defending the lawsuit on the merits and their failure to timely file a motion to dismiss waived their right to assert the defense of improper service.

## II.  Damages

At the April 22 hearing, Sims' testimony and related documentation established the following undisputed facts. After her discharge from Mme. Paulette's, Sims was unemployed from approximately May 1, 1982 to mid-July, 1983, except for a three-month period during which she was employed by Faust Brothers Dry Cleaners ("Faust Brothers") and rare occasions when Sims was able to find "day work." In mid-July 1983, Sims obtained employment as a presser at Cadillac Cleaners ("Cadillac"), where she is presently employed.

Sims was earning approximately $263 per week at Mme. Paulette prior to her termination. She earned $11,476[3] at Cadillac in 1983. As to Sims' earnings during her sixty-three week period of unemployment, Sims earned $2,999 from Faust Brothers and approximately $300 doing day work. In addition, Sims collected unemployment compensation both before and after she worked at Faust Brothers, with the exception of a two-week period in August 1982 during which Sims went to Hawaii. Sims collected a total sum of $2,233 in unemployment benefits.

Both parties agree that Sims is not entitled to backpay for the two weeks that Sims was in Hawaii, and that the wages which Sims earned by doing day work and from Faust Brothers must be deducted from any backpay award. However, defendants argue that Sims is not entitled to *any* backpay, nor to front pay or liquidated damages. For the reasons set forth below we conclude that Sims is entitled to $11,038 in backpay and $11,038 in liquidated dam-

---

**2.** The defendants' claim that plaintiff should be charged with knowledge that the defendants were still asserting the defense because the plaintiff failed to timely move to strike the defense is without merit. Plaintiff's omission in this regard does not excuse defendants' conduct in defending against the motion without cross-moving to dismiss or otherwise asserting their claim.

**3.** All figures have been rounded to the nearest whole dollar.

ages but that she is not entitled to a front pay award.

## A. Back Pay

Citing *Martinez v. El Paso County*, 710 F.2d 1102, 1106 (5th Cir. 1983), defendants argue that Sims is not entitled to any backpay because no presser vacancy currently exists at Mme. Paulette. *Martinez*, however, does not stand for that extraordinary proposition. *Martinez* held merely that a Title VII plaintiff cannot receive backpay for any period of time after the *elimination* (for non-discriminatory reasons) of plaintiff's position unless the plaintiff can justify such an award by showing, for example, that, but for the employer's unlawful discrimination, plaintiff would have been retained in another capacity.

■ Defendants have not provided any authority for the contorted proposition that the employer's merely filling the position formerly held by the unlawfully discharged employee relieves the employer from liability for backpay. Indeed, the argument borders on the absurd. Accepting such a proposition would allow employers to improperly discriminate with impunity and would render the anti-employment discrimination laws completely ineffectual.

■ Defendants argue further that Sims is not entitled to any backpay because the defendants (allegedly) discharged Sims in good faith. This proposition, too, is without merit. Backpay may be denied after a finding of unlawful discrimination only if there are carefully articulated "reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). *Albemarle* held further that the absence of employer bad faith does not justify withholding back pay:

> If backpay were awardable only upon a showing of bad faith, the remedy would become a punishment for moral turpi-

tude, rather than a compensation for workers' injuries. This would read the "make whole" purpose right out of Title VII, for a worker's injury is no less real simply because his employer did not inflict it in "bad faith."

*Id.* at 422, 95 S.Ct. at 2373.

Alternatively, the defendants argue that even if Sims is entitled to backpay, she should not be compensated for any period after mid-January 1983 because she quit her job with Faust Brothers. The argument is not supported by the facts or the law.

■ Sims testified during direct examination that Faust Brothers "let her go" because of a complaint that Sims had incorrectly pressed a fancy gown. On cross-examination, Sims stated that she did not leave Faust Brothers voluntarily. If a Title VII plaintiff

> has obtained employment equivalent to that from which he was excluded by the defendant, and quits without adequate reason, the backpay award must be offset by the amount the plaintiff would have earned had he kept the job.

*Griffin v. George B. Buck Consulting Actuaries*, 566 F.Supp. 881, 882 (S.D.N.Y. 1983). The rule that backpay must be offset by the amount the plaintiff would have earned is no less applicable if the plaintiff willfully engages in conduct in order to be fired. *Cf. Ford Motor Co. v. Equal Employment Opportunity Commission*, 458 U.S. 219, 231 n.15, 102 S.Ct. 3057, 3065 n. 15, 73 L.Ed.2d 721 (1982) ("[D]eductions should be made not only for actual earnings by the worker but also for losses which he willfully incurred [citation omitted]."

We find that Sims did not deliberately engage in conduct so that she would be fired. Despite counsel's attempts on cross-examination to get the plaintiff to admit that she purposefully pressed the gown incorrectly (so that she would be discharged and therefore could collect unemployment compensation), Sims continued to maintain that the gown incident arose over an innocent mistake. The defendants did

not introduce any evidence which would cast doubt on Sims' statements in that regard.

Further, under New York law, unemployment benefits cannot be collected after a willful loss of employment. *See* New York Lab. Law § 593.2 (McKinney 1977 & Supp. 1986); *Matter of Hulse*, 41 N.Y.2d 813, 393 N.Y.S.2d 386, 361 N.E.2d 1034 (1972). Therefore, the fact that Sims collected unemployment benefits after leaving Faust Brothers is added evidence that Sims did not leave Faust Brothers intentionally. Accordingly, Sims' backpay award need not be offset by wages Sims would have earned had she kept the Faust Brothers job.

Defendants next argue that even if the court should find that Sims did not willfully leave Faust Brothers, Sims is not entitled to backpay for any part of 1983, including the first six months in which she was unemployed, because the salary which Sims earned at Cadillac between mid-July 1983 and December 1983 exceeded the amount of money she would have earned in one year at Mme. Paulette.

Sims' post-trial brief is silent on the issue of whether Sims' Cadillac wages should be subtracted from her backpay.[4] However, Sims proposes that her backpay award should be reduced only by amounts which she earned from May 1, 1982 to mid-July 1983, thereby implying that the salary she earned at Cadillac between mid-July and December 1983 should not be deducted from a backpay award.

■ A Title VII plaintiff is entitled to backpay from the date of discharge until the date the plaintiff secures employment that is comparable to that from which she was unlawfully terminated, *see Ford Motor Co. v. Equal Employment Opportunity Commission*, 458 U.S. at 234–35, 102 S.Ct. at 3066–67, less *"interim* earnings or amounts earnable with reasonable diligence."* 42 U.S.C. § 2000e–5(g) (emphasis supplied). While acceptance of comparable employment terminates the ongoing injury caused by the employer's acts, the plaintiff nevertheless is entitled to "full redress for the effects of discrimination." *Id.* at 232, 102 S.Ct. at 3066; *see also id.* at 234–35, 102 S.Ct. at 3066–67.

■ Here, Sims' earnings at Cadillac were not "interim earnings." Moreover, using Sims' wages from Cadillac as an offset against her backpay award is inconsistent with the goal of barring "like discrimination in the future," *Albemarle Paper Co. v. Moody*, 422 U.S. at 418, 95 S.Ct. at 2372, because it would allow the employers to draw an inference that their discriminatory act has consequences to them only if plaintiff fails to secure comparable employment. Further, computing damages in the manner which the defendants propose would not fully redress the past discriminatory effects because such a calculation ignores the hardship which Sims faced during the first six months of 1983 when she had less than $3000 at her disposal due to the defendants' actions. Finally, reducing Sims' backpay award by her Cadillac earnings would, in effect, punish Sims for using "due diligence" to secure comparable employment, as the law requires. Accordingly, we conclude Sims' wages from Cadillac are not properly deductible from backpay.

Relying solely on the testimony of Ann Mahdessian, who stated that Mme. Paulette employees who get paid by the piece ("pieceworkers") do not, nor did they at the time Sims was working there, get a paid vacation, the defendants argue that the equivalent of two weeks wages should be deducted from Sims' backpay.

Sims testified that she regularly received two weeks paid vacation when she worked at Mme. Paulette. She stated further that her last vacation period was in October of 1981, but that rather than take a two week leave, she worked the two weeks and therefore received her regular pay plus her vacation pay.

---

4. For reasons which are unexplained, Sims' pretrial brief conceded that Sims' Cadillac earnings should be deducted from backpay. Plaintiff has altered her position in her post-trial brief.

The defendants have the burden of proving amounts which must be deducted from Sims' gross backpay. *See Equal Employment Opportunity Commission v. Kallir, Phillips, Ross, Inc.*, 420 F.Supp. 919, 924 (S.D.N.Y.1975), *aff'd mem.*, 559 F.2d 1203 (2d Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). Here, defendants must demonstrate that Sims did not receive vacation pay and that she would have taken two weeks off between May 1982 and mid-July 1983.

■ In light of the conflicting testimony as to the vacation policy for pieceworkers we cannot conclude that it is more likely than not that Sims received unpaid vacations. We note that while Sims was not the only pieceworker at Mme. Paulette, the defendants did not produce any testimony on the subject from any non-interested party. Moreover, no evidence at all was adduced which would have tended to show that it was more likely than not that Sims would have taken a two-week vacation in 1982–1983. In sum, we conclude that the defendants have not met their burden of proving that two weeks pay should be deducted from Sims' award.

Whether Sims' backpay award should be offset by the amount Sims received in unemployment benefits presents a closer question than any other issue which the defendants have raised.

The Supreme Court held in *NLRB v. Gullett Gin Co.*, 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951), that unemployment compensation is a "collateral benefit," that the failure to reduce a backpay award by unemployment benefits did not make the employee more than "whole," and that the Board had the power to refuse to deduct unemployment compensation from backpay. Although *Gullett Gin* was decided in the NLRB context, the NLRB model was extensively relied upon by the Supreme Court in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280, a leading Supreme Court case on backpay under Title VII.

The plaintiffs in *Equal Employment Opportunity Commission v. Enterprise Association Steamfitters Local No. 638*, 542 F.2d 579, 591 (2d Cir. 1976), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977), objected to the offset of public assistance payments from backpay, referring to the Supreme Court's decision in *Gullett Gin*. The Court of Appeals for this Circuit recognized that "[t]he weight of common law authority is that collateral sources are not deductible from a tort damage award," *Steamfitters*, 542 F.2d at 591–92, but nevertheless held that it is not an abuse of discretion for a district court "to deduct sums received from collateral sources such as unemployment compensation." *Id.* at 592. However, *Steamfitters* did suggest that it may be appropriate to refuse to deduct unemployment benefits from a backpay award in cases in which there are "compelling reasons of deterrence or retribution." *See id.*[5]

The defendants in this case clearly have not demonstrated the utmost respect for Sims' right to be free from discrimination. After unlawfully discharging Sims for filing a complaint with the EEOC, the defendants then contested Sims' entitlement to unemployment compensation. As a result, Sims was unable to collect benefits until the Administrative Law Judge ("ALJ") who was handling Sims' case reversed his earlier decision in which he had found that Sims was not entitled to benefits because she had been fired for misconduct. In his second decision, which held that Sims was entitled to compensation, the ALJ noted:

---

**5.** This Circuit's discretionary rule appears to be the minority view. *See, e.g., Craig v. Y & Y Snacks*, 721 F.2d 77, 83–84 (3d Cir. 1983); *Rasimas v. Michigan Department of Mental Health*, 714 F.2d 614, 627–28 (6th Cir. 1983), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984); *Brown v. A.J. Gerrard Manufacturing Co.*, 715 F.2d 1549, 1550 (11th Cir.1983) (en banc); *Kauffman v. Sidereal Corp.*, 695 F.2d 343, 346–47 (9th Cir. 1982); *E.E.O.C. v. Ford Motor Co.*, 645 F.2d 183, 195–96 (4th Cir. 1982), *rev'd on other grounds*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721, *adhered to original position on remand*, 688 F.2d 951, 952 (4th Cir.1982) (per curiam).

There have been six hearings scheduled in this case and the employer has failed to appear at three of the hearings. Although duly notified the employer failed to appear at the last two duly scheduled hearings.

See Plaintiff's Trial Memorandum, Exhibit 3 (December 29, 1982 decision of the ALJ).

Moreover, the defendants have repeatedly delayed the proceedings in the instant action. For example, defendants failed to appear at a court-ordered deposition, an omission for which sanctions were imposed.

On these facts, Sims' argument, that her unemployment benefits should not be deducted from her backpay because there are compelling reasons in this case for deterrence, is not without merit. However, an award which seeks to remedy the ill effects of discrimination must be consistent with the Title VII scheme, which, although aimed at deterring future discrimination, nevertheless does not permit general or punitive damages. See Davidson v. Yeshiva University, 555 F.Supp. 75, 80 (S.D.N.Y. 1982).

The defendants in this action already will feel the sting of economic deterrence from more than the backpay award since we have held for the reasons set forth in Point II.(B) below that, due to the defendants' lack of good faith, Sims is entitled to liquidated damages in an amount equal to the backpay which Sims receives as a result of this action. Although liquidated damages have been granted pursuant to plaintiff's cause of action for FLSA violations, the identical acts complained of form the bases for the defendants' liability under Title VII. Moreover, in addition to their liability for liquidated damages, the defendants have had to pay $1,769.45 in attorneys' fees due to their failure to appear for the scheduled depositions.

■ Mme. Paulette is not a large conglomerate but a small "Mom and Pop" cleaning business which employs a handful of workers. It is not Title VII's remedial purpose to exact the destruction of a business as the price for employment discrimination. Rather, its purpose is to make the plaintiff whole and to ensure the employer's future compliance with the mandates of the Act. In determining what is an appropriate award, mathematical precision is not expected. However, district courts must fashion the most complete relief possible after evaluating the peculiar circumstances of each case. Upon considering the foregoing, we conclude that in this case, the remedial goals of the statute will be fulfilled if Sims' backpay award is reduced by the amount of money she received in unemployment compensation.

### B. Liquidated Damages

■ Defendants argue that Sims is not entitled to liquidated damages because Title VII does not provide for general or punitive damages. While defendants correctly state the law as to Title VII, see, e.g., Davidson v. Yeshiva University, 555 F.Supp. at 80, in the case at hand, Sims has prevailed as well upon her cause of action against the defendants for violating the FLSA. Under the FLSA, Sims is entitled to liquidated damages unless the employer acted in good faith, which, under the Act, means at least that the employer attempted to ascertain what the law requires and to comply with its mandates. See Laffey v. Northwest Airlines, 567 F.2d 429, 464–65 (D.C.Cir.), cert. denied, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1977); cf. Donovan v. Kaszycki & Sons Contractors, Inc., 599 F.Supp. 860, 871 (S.D.N.Y.1984) (describing what is necessary to establish "good faith" under the Portal-to-Portal Act, 29 U.S.C. § 260).

■ Here, in granting Sims' motion for summary judgment we found that Noubar Mahdessian had several times admitted that he adversely altered the terms of Sims' employment because she filed the EEOC complaint. Sims v. Mme. Paulette Dry Cleaners, 580 F.Supp. 593, 596 (S.D.N.Y.1984). Such admissions are tantamount to admitting bad faith. Moreover, the defendants have provided no evidence to show that they made a good faith effort to learn and comply with the law's require-

ments. Instead, they argue that they did not know the mandates of the law and that their ignorance excuses their action. Ignorance of the law, however, "is no defense to a claim for liquidated damages" under FLSA. *Donovan, supra,* 599 F.Supp. at 871.

### C. Front Pay

■ Sims requests six months "front pay" in lieu of reinstatement. The defendants' only response is that Sims is not entitled to front pay because there is currently one less presser at Mme. Paulette. A general reduction in the workforce, however, is not a valid defense to a claim of front pay. Notwithstanding the defendants' failure to provide any meaningful guidance on the issue we conclude for the reasons set forth below that Sims has not established that she is entitled to front pay.

The common alternative to reinstatement is an award of "front pay", based on reasonably anticipated future losses of salary caused by unlawful discrimination [citations omitted].

*Francoeur v. Corroon & Black Co.,* 552 F.Supp. 403, 413 (S.D.N.Y.1982). Front pay generally is awarded when reinstatement is not feasible but the plaintiff has not yet secured comparable employment. *See id.; EEOC v. Kallir, Phillips, Ross, Inc.,* 420 F.Supp. 919 (S.D.N.Y.1976), *aff'd mem.,* 559 F.2d 1203 (2d Cir.), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977).

■ Sims has not demonstrated that she will suffer any further losses of salary due to the defendants' actions. Indeed, not only has Sims secured employment, but she has had the good fortune of obtaining a more lucrative position. It may be true that Sims does not have the seniority at Cadillac that she attained after sixteen years at Mme. Paulette. However, Sims has not established that her seniority at Mme. Paulette had attendant benefits which she does not have at Cadillac, nor has she provided any other evidence which would prove that her employment at Cad-

illac is not (at least) comparable to her position with Mme. Paulette. In sum, there is no compelling reason in this case to award front pay.

### Conclusion

For the foregoing reasons Sims is entitled to judgment in the amount of $22,076 plus interest at the New York legal rate, on a non-compounded but annually determined basis, as well as reasonable attorneys fees, the precise amount of which will be determined subsequent to plaintiff's filing detailed documentation. Such documentation should be submitted promptly.

It is so ordered.