**Anne DAILEY, Plaintiff,**

v.

**Societe GENERALE, Defendant.**

**No. 94 Civ. 1649 (JGK).**

United States District Court,
S.D. New York.

June 20, 1995.

Laura S. Schnell, Margaret L. Watson, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for plaintiff.

Michael A. Kalish, Winthrop, Stimson, Putnam & Roberts, New York City, for defendant.

## OPINION AND ORDER

KOELTL, District Judge:

The plaintiff, Anne Dailey ("Dailey"), brought this action against her former employer, Societe Generale ("the Bank"), on March 10, 1994. Dailey alleged that the Bank had intentionally discriminated against her by paying her less compensation than it paid male employees for work of substantially equal skill, effort and responsibility under similar working conditions. She also alleged that the Bank intentionally retaliated against her by terminating her because of her complaints to people at the Bank about discrimination. Dailey brought her claims under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, Executive Law § 296 *et seq.* ("Human Rights Law"), and the Administrative Code of the City of New York § 8–101 *et seq.* ("Administrative Code"). She sought compensatory and punitive damages as well as declaratory and injunctive relief.

Following a five-day trial, the jury rendered a special verdict for the plaintiff under Title VII and the Human Rights Law, finding that the Bank had intentionally retaliated against the plaintiff for her complaints of discrimination and awarding her $300,000 in back pay and $100,000 in compensatory damages for pain, suffering, humiliation and mental anguish. The jury also found, under both statutes, that the Bank did not discriminate against the plaintiff.[1]

The parties have made several applications to the Court in connection with the judgment to be entered. The issues related to the judgment include: first, whether the Court is required to make independent findings with respect to back pay under Title VII; second, whether to deduct the unemployment compensation that Dailey has received from the damages award; and third, whether to award prejudgment interest.

### I.

Societe Generale is a French bank with offices in New York City. Dailey was hired by the Bank in the Fall of 1990 in the position of Vice President in the Financial Institutions Group and Manager of the Correspondent Banking Group. In the discussions preceding her joining the Bank, Dailey

---

1. The defendant had raised an argument with respect to this Court's jurisdiction over the plaintiff's claim under the Administrative Code. The parties agreed to postpone resolution of the issue until after the jury rendered a verdict because the plaintiff intended to resort to the Administrative Code only if the jury had awarded punitive damages exceeding the cap permitted by Title VII. Because the jury did not award any punitive damages to the plaintiff, the parties agree that the issue with respect to the Administrative Code has been rendered moot.

asked for a salary of $85,000 and the Bank agreed to her request. She did not request a sign-on bonus and she did not receive one. Dailey commenced her employment on November 26, 1990 and remained at the Bank until the beginning of January, 1993.

From November 26, 1990 to August 20, 1992, Dailey reported to Alan White ("White"), the First Vice President and Manager of the Financial Institutions Group. During her first two years at the Bank, while under the supervision of White, Dailey received two performance appraisals, both ranking her performance as superior. She also received an eight percent salary increase shortly before her one year anniversary at the Bank and she received a discretionary performance bonus of $18,900 based on her performance in 1991, both indicating that the plaintiff was performing well.

White's employment at the Bank was terminated on August 29, 1992 in connection with a transaction known as Amerifund. At that time, Jay Sands ("Sands") replaced White and became Dailey's supervisor. On approximately November 30, 1992, Sands gave Dailey a written performance appraisal rating Dailey's overall performance as falling below expectations.

At trial, Dailey testified about the discrimination she perceived at the Bank, focusing on the fact that the Bank paid two male vice presidents in the Financial Institutions Group greater compensation for work that she believed required substantially equal skill, effort and responsibility under similar working conditions. Accordingly, there was extensive testimony pertaining to the job responsibilities of the plaintiff and the two male employees, their performance, their educational backgrounds, their training, their employment experience and the circumstances surrounding each of their joining the Bank.

The plaintiff and the defendant painted radically different pictures of Dailey's performance at the Bank, making credibility a crucial issue at trial. While Dailey testified about what she believed to be her significant contributions to the Bank and her good working relationship with her staff, the defendant presented numerous witnesses to refute Dailey's testimony on all counts. The Bank's witnesses testified not only that the plaintiff's performance was seriously deficient in some respects, but also that the plaintiff had made material misrepresentations to the Bank in connection with her application for employment and that the plaintiff had a relationship with her staff that was difficult, at best. The plaintiff and the defendant also presented totally contradictory versions of the circumstances surrounding the plaintiff's being placed on disciplinary probation in connection with the Amerifund transaction for which White had been terminated.

With respect to the plaintiff's retaliation claim and the circumstances surrounding the plaintiff's departure from the Bank, the parties, again, presented competing versions of events to the jury. Dailey claimed that on several occasions, she complained to people in senior positions at the Bank, including the Manager of Human Resources, Kevin Hughes ("Hughes"), that there was a gender-based disparity in compensation that resulted in her being paid lower compensation than similarly situated male employees. The Bank's witnesses denied these allegations.

Dailey testified that following her receipt of the negative evaluation from Sands, she spoke with Hughes regarding her perception that the evaluation was unjustified and her belief that it was the result of sex discrimination. She testified that following the meeting in which she complained, Hughes told her that he had negotiated an arrangement with senior management whereby she would leave the Bank in exchange for six months of salary continuation and outplacement services. Under this arrangement, the plaintiff was to sign a release, giving up her right to take any legal action against the Bank. The plaintiff testified that she had not wanted to leave the Bank, but that she considered the offer and decided that six months of salary continuation would not be sufficient because she would not be able to find another job in that period of time. Hughes then was able to work out an arrangement whereby Dailey's salary would be extended month by month, for an additional six months, provided

that the Bank got reports that Dailey was doing her best to find another job.

According to Dailey, after Hughes communicated this second offer to her, he told her that he would not negotiate with management any further and that, if she did not take the offer, he would pull her out of outplacement and "cut her off at the knees." Dailey testified that Hughes then set her final day at the Bank and told her to report to outplacement. Following approximately two and a half weeks of outplacement, Dailey was told, by the outplacement firm, that she was not permitted to return. At trial, Dailey claimed that she was terminated in retaliation for her complaints of sex discrimination.

At trial, Hughes testified that after Dailey had received the negative evaluation from Sands, Dailey come to his office and said she "wanted out" and demanded a severance package. Hughes testified that Dailey never complained to him of sex discrimination during any of his conversations with her. He testified that while he encouraged Dailey to work things out with Sands and remain at the Bank, he also agreed to try to get Dailey some kind of severance package. He testified that Dailey told him that she would accept a package that consisted of six months of salary continuation, along with outplacement services, and that she would sign a release; he also testified that when he communicated such an offer to Dailey, she shook hands with him, agreeing to the arrangement.

Hughes testified that the day after Dailey accepted the arrangement, she came back to him and said that six months of salary continuation would not be enough because she could not get another job in that time. He stated that he then said he would try to extend her salary month-to-month for another six months but that, in any event, because she had stopped dealing with Sands and had ceased fulfilling the obligations of her job, he set her last day at the Bank. In answering a

question by the Bank's counsel with respect to Dailey's claim that Hughes said he would "cut her off at the knees," Hughes testified that what he probably said was that if she did not sign the release in twenty-one days, and accept the terms of the package, he would cut off her salary. And, Hughes testified that when the twenty-one day period elapsed, and Dailey had not signed the release, he instructed the payroll department to remove her name from the payroll and he informed the outplacement firm that the Bank no longer would pay for Dailey's use of outplacement services.

Following her departure from the Bank, Dailey looked for another job in banking without success. In August, 1993, she left New York and subsequently enrolled in St. Francis College in Loretto, Pennsylvania, to pursue a degree so that she could become a physician's assistant. Dailey presently is a full-time student.

## II.

■ The parties disagree on whether, under Title VII, back pay appropriately is an issue for the Court or the jury. While the 1991 amendments to Title VII provide a right to a jury trial for a plaintiff seeking compensatory or punitive damages, *see* 42 U.S.C. § 1981a(c)(1), they specifically exclude back pay from the compensatory damages that are recoverable, seeming to indicate that back pay remains an issue for the Court. Specifically, the statute provides:

> Compensatory damages awarded under this section shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000e–5(g)].

42 U.S.C. § 1981a(b)(2).[2]

While the plaintiff contends that a plain reading of the statute supports the conclusion that the calculation of back pay properly is for the jury, both parties agree that even if

---

2. 42 U.S.C. § 2000e–5(g) provides, in relevant part:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful

employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e–5(g)(1).

back pay is an issue for the Court, the Court, sitting in equity, is bound by the jury's factual findings under the Human Rights Law, making the issue academic. *See Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1048 (2d Cir.1992) (court must make findings on Title VII claims in accordance with the jury's determination on Human Rights Law claims); *Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 954 (2d Cir.1988) (jury determination of factual issues on plaintiff's claim under 42 U.S.C. § 1981 precludes the court from deciding the issues in a contrary way for purposes of Title VII claim); *see also In re Lewis*, 845 F.2d 624, 629 (6th Cir.1988) ("One important reason that a judge is not to make findings that contravene a jury's verdict is that the verdict is *res judicata* with respect to the factual issues which would have necessitated jury resolution.").[3]

In making its findings under Title VII, the Court, therefore, adopts the jury's finding that the Bank retaliated against the plaintiff for having complained of discrimination and will enter judgment accordingly in the amount of damages specified by the jury. The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### III.

■ While acknowledging that the Court of Appeals has not decided whether unemployment benefits should be deducted from a plaintiff's recovery, the defendant argues that the plaintiff's award of back pay should have deducted from it the $9,900 in unemployment compensation that the plaintiff received following her departure from the Bank. The defendant relies on cases from within this circuit that have deducted such amounts from awards of back pay. *See, e.g., Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 47 (2d Cir.1980); *Sims v. Mme. Paulette Dry Cleaners*, 638 F.Supp. 224, 232 (S.D.N.Y. 1986) (Lasker, J.). The plaintiff, on the other hand, argues that the Court should not deduct such collateral source payments from the plaintiff's recovery, relying on cases from within this circuit, as well as the trend in the majority of other circuits declining to deduct such payments. *See, e.g., Meschino v. International Tel. & Tel. Corp.*, 661 F.Supp. 254, 261 (S.D.N.Y.1987); *Gaworski v. ITT Commercial Fin. Corp.*, 17 F.3d 1104, 1113 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994).

In *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251 (2d Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992), the Court of Appeals, while holding that the defendant had waived its argument that collateral source payments should have been offset from the plaintiff's

---

**3.** While the parties find the language of 42 U.S.C. § 1981a ambiguous with respect to whether back pay is an issue for the Court or the jury, that provision appears to leave the issue for the Court. In *Landgraf v. USI Film Prods.*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Supreme Court, in discussing the 1991 amendments to Title VII, explained:

> Before the enactment of the 1991 Act, Title VII afforded only 'equitable' remedies. The primary form of monetary relief available was backpay. Title VII's back pay remedy ... is a 'make-whole' remedy that resembles compensatory damages in some respects. However, the new compensatory damages provision of the 1991 Act is 'in addition to,' and does not replace or duplicate, the backpay remedy allowed under prior law. Indeed, to prevent double recovery, the 1991 Act provides that compensatory damages 'shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964.'

*Id.,* —— U.S. at —— ——, 114 S.Ct. at 1490–91 (citations omitted); *see also Braverman v.* *Penobscot Shoe Co.*, 859 F.Supp. 596, 605–06 (D.Me.1994) (court determined back pay under 42 U.S.C. § 1981a); *Lussier v. Runyon*, Civ. No. 92–397–P–H, 1993 WL 434078, *2 (D.Me. Oct. 15, 1993) ("Back pay and front pay have traditionally been treated as equitable relief, with no right to a jury trial. The Civil Rights Amendments of 1991 did not alter the treatment of back pay, explicitly excluding it from the definition of compensatory damages.") (citations omitted); *Simpson v. Lucky Stores, Inc.*, No. C–92–2916, 1993 WL 414668, *3 (N.D.Cal. Oct. 6, 1993) ("Since there is no right to a jury trial on the availability under Title VII [as amended in 1991] of the equitable remedies of injunctive relief and back pay, these matters are committed to this court for determination.") (citations omitted); 3 Edward J. Devitt et al., Federal Jury Practice and Instructions § 104.06 (Supp.1994) (back pay is not available under 42 U.S.C. § 1981a and, in considering a plaintiff's claim for back pay, the court is bound by the jury's verdict concerning liability under the doctrine of collateral estoppel).

award, noted: "Whether unemployment compensation and social security benefits should automatically be deducted from an award of lost wages has not been answered by this circuit." *Id.* at 258. The court then went on to note:

> While collateral source payments do represent an additional benefit to the plaintiff, we note a sister circuit's view that '[a]s between the employer, whose action caused the discharge, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer.'

*Id.* (citing *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 795 (3d Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986)). Elaborating on this rationale in *Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104 (8th Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994), in the context of the Age Discrimination in Employment Act, the Court of Appeals for the Eighth Circuit explained:

> Reducing a backpay award by unemployment benefits paid to the employee, not by the employer, but by a state agency, makes it less costly for the employer to wrongfully terminate a protected employee and thus dilutes the prophylactic purposes of a backpay award. Indeed, it leads to a windfall to the employer who committed the illegal discrimination. By virtue of state aid provided 'to carry out a policy of social betterment for the benefit of the entire state,' and not 'to discharge any liability or obligation' of the employer, the employer winds up paying less to the employee than it would have had it not illegally terminated him.

*Id.* at 1113 (citations omitted).

In *Williams v. Secretary of the Navy,* 853 F.Supp. 66 (E.D.N.Y.1994) (Nickerson, J.), the court, based on the specific facts of that case, deducted unemployment compensation that the plaintiff had received from the plaintiff's back pay award. *Id.* at 72. The court, however, noted that "[m]ost other circuits have held that unemployment insurance should not be deducted from back pay awards" on the rationale that funds obtained from a source unconnected with the culpable party should not be used to reduce that party's liability. *Id.* In *Williams,* the defendant had, in effect, paid for the plaintiff's unemployment compensation, making such rationale inapplicable to that case. *Id.*

The facts of this case do not present any justification for departing from the reasoning expressed in *Promisel* with respect to allocating among the parties the unavoidable windfall. Therefore, unemployment compensation will not be deducted from the plaintiff's back pay award.

## IV.

Dailey seeks prejudgment interest on the jury's back pay award of $300,000. The Bank argues that the Court should deny prejudgment interest because under the amendments to Title VII, back pay no longer is taxable and because the plaintiff has been attending school and "reap[ing] the benefits of further education[ ]" since she left the Bank; according to the Bank, an award of prejudgment interest would result in the plaintiff's being "triply compensated for the time after she left the Bank to [the] time of judgment." (Letter from Michael A. Kalish dated 6/8/95.)

█ It is within this Court's sound discretion to award prejudgment interest on the plaintiff's back pay damages. In *Loeffler v. Frank,* 486 U.S. 549, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988), the Supreme Court noted that in Title VII suits, prejudgment interest on back pay awards "of course, is an 'element of complete compensation.'" *Id.* at 558, 108 S.Ct. at 1971 (citing *West Virginia v. United States,* 479 U.S. 305, 310, 107 S.Ct. 702, 706, 93 L.Ed.2d 639 (1987)). Title VII authorizes interest awards as "a normal incident of suits against private parties[.]" *Id.* In *Clarke v. Frank,* 960 F.2d 1146 (2d Cir.1992), the Court of Appeals for the Second Circuit affirmed the district court's award of prejudgment interest under Title VII on the plaintiff's back pay award. The court explained:

> Prejudgment interest discourages an employer from attempting to 'enjoy an interest-free loan for as long as [it can] delay paying out back wages.' ... Thus, we have held that 'it is ordinarily an abuse of

discretion *not* to include pre-judgment interest in a back-pay award....'

*Id.* at 1153–54 (citations omitted) (emphasis in original).

 In *Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,* 955 F.2d 831 (2d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992), a case decided under the Labor Management Relations Act, the Court of Appeals discussed the relevant factors to be applied in making a discretionary award of prejudgment interest:

> [T]he award should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

*Id.* at 833–34 (citing, *inter alia, Loeffler v. Frank,* 486 U.S. 549, 557–58, 108 S.Ct. 1965, 1970–71, 100 L.Ed.2d 549 (1988)).

 There are no extraordinary reasons to depart from the cases which have authorized prejudgment interest on back pay awards in Title VII cases. Interest is necessary to place the plaintiff in the position she would have been in had she received her salary when it was owed and had she not left the Bank. The purposes of Title VII—to deter violations of the statute and to make the plaintiff whole—are both served by a prejudgment interest award on the back pay portion of the damage award.

The Bank's argument with respect to "triple compensation" is not supported by any authority and does not justify departing from the general rule with respect to prejudgment interest. The Court will, therefore, award prejudgment interest on the back pay damage award. Pursuant to the stipulation between the parties, the amount of prejudgment interest is $32,796.22.[4]

V.

For the foregoing reasons, judgment will be entered for the plaintiff on her retaliation claim in the amount of $300,000 in back pay, $100,000 in compensatory damages and $32,796.22 in prejudgment interest.[5]

**SO ORDERED.**

---

4. In calculating the amount of prejudgment interest, the parties have used the method used by this Court in *McIntosh v. Irving Trust Co.,* 873 F.Supp. 872 (S.D.N.Y.1995), which involves using the average annual United States treasury bill rate and compounding interest annually. The parties have represented that the average annual United States treasury bill rate for the period January 29, 1993 to date is 4.77%.

5. While declaratory and injunctive relief are available under Title VII, the plaintiff has not sought such relief in connection with the entry of the judgment; indeed, there would be no basis for such relief here. While the jury found that the Bank retaliated against the plaintiff, neither the plaintiff nor the individual who was alleged to have retaliated against her are still employed by the Bank.